**RED STAR TOWING & TRANSPORTA-
TION COMPANY, INC., Plaintiff,**

v.

**The Cargo Ship "MING GIANT",
Yangming Marine Transport
Corp., Defendant.**

In the matter of Complaint of RED STAR TOWING & TRANSPORTATION COMPANY, INC. as owner of the TUG OCEAN KING for exoneration from or Limitation of Liability.

**Lorraine MOWEN as Administratrix of
the Estate of Dennis Mowen, Plaintiff,**

v.

**YANGMING MARINE TRANSPORT
CORP., and Red Star Towing & Trans-
portation Company, Inc., Defendants.**

Nos. 78 Civ. 2442, 78 Civ. 5448 and 78 Civ. 5537 (PNL).

United States District Court,
S.D. New York.

Dec. 3, 1982.

As Modified March 4, 1983.

Richard H. Brown, Jr., Harry A. Gotimer, Kirlin, Campbell & Keating, New York City, for Yangming Marine Transport Corp.

## OPINION

LEVAL, District Judge.

Red Star Towing and Transportation Co. and Yangming Marine Transportation Corp. move for post-verdict relief from an award of damages in favor of claimant Lorraine Mowen. The jury found damages in the amount of $1,964,000 for the death of Dennis Mowen, plaintiff's decedent, assessing 35% against Red Star, 60% against Yangming, and charging 5% responsibility to Mowen for his own death. Defendants[1] Red Star and Yangming renew their pre-trial motions to strike Mowen's demand for a jury trial; they also move for judgment notwithstanding the verdict, and to set aside or reduce the verdict.

The motions to set aside or reduce the verdict are granted by reason of the excessiveness of the jury's award and the willful misconduct of plaintiff's counsel in tampering with the evidence transmitted to the deliberating jury. Unless plaintiff agrees to remit $665,000, the verdict will be set aside.

The motions opposing jury trial are denied, as are the motions for judgment n.o.v.

*Facts*

The trial lasted over three and a half months and involved proof of over 40 separate contentions of fault on the part of the various actors. A brief sketch of the facts here suffices.

At about 04:44 hours on May 20, 1978, Red Star's tug, the Ocean King, under the command for that watch of the mate, Dennis Mowen, was towing a barge in an easterly direction across the shipping lanes leading toward New York harbor about 4 miles south of Ambrose Light. Yangming's steamship Ming Giant was sailing northward toward New York harbor. The two ships were in a crossing situation. Under

---

Theodore Friedman, Jethro M. Eisenstein, Friedman & Eisenstein, New York City, for Lorraine Mowen.

Fred J. Cuccia, Cuccia & Oster, New York City, for Lorraine Mowen.

James M. Leonard, Stephen J. Buckley, McHugh, Leonard & O'Connor, New York City, for Red Star Towing & Transp. Co.

---

1. For convenience, Red Star and Yangming are referred to as "defendants" and Lorraine Mowen as "plaintiff," although this does not accu- rately designate their procedural roles, which are explained below.

the International Regulations for Preventing Collisions at Sea (the Rules of the Road), 33 U.S.C. foll. § 1602 (1976), the Ocean King was the give-way vessel as she had the Ming Giant on her starboard side. Rule 15. It was the Ocean King's obligation to keep clear, Rule 16, ordinarily by making a timely starboard turn so that the vessels would pass each other port-to-port.

Mowen put the Ocean King into a starboard turn. There was some evidence that he was late in making the turn so that he crowded close to the Ming Giant's course.

As the standby vessel, the Ming Giant would ordinarily maintain her course and speed, leaving it to the give-way vessel to keep clear. Rule 17(a)(i). Ming Giant had the option under Rule 17(a)(ii), (c) to alter course to starboard to avoid close calls. She was also permitted, but only under the demands of an emergency, to turn to port. Rule 17(b), (c).

The captain of the Ming Giant mistakenly believed the Ocean King was crossing his bow. He testified he believed she was sufficiently far ahead that if he maintained course, he would collide with the tow, and if he turned right, he would hit the tug. He therefore chose the *in extremis* course of turning to port, which he did while the tug was making her turn to starboard. There was evidence that both vessels had failed to sound the required whistle signals until it was too late. The vessels collided. After the collision, Mowen was found to be missing. Two other seamen on the tug suffered minor injuries and both vessels were damaged. There was evidence of fault on the part of both vessels in their failure to take appropriate action to save Mowen.

Red Star first instituted an action in this court against Yangming for collision damages and indemnification for potential liability. Lorraine Mowen instituted an action in Supreme Court, New York County, for herself and her children, against both Red Star and Yangming. Red Star then petitioned in admiralty for exoneration from or limitation of liability. Mowen's state court action was removed to federal court. I issued the usual injunction under Fed.R.

Civ.P. Supplemental Rule F(3) staying the prosecution of suits against Red Star outside the limitation proceeding until its resolution. Mowen, Yangming and the two other injured seamen filed claims against Red Star in the limitation proceeding. Mowen also filed a cross-claim against Yangming. The two injured seamen filed a separate action against Yangming. These seamen settled their claims against Yangming and Red Star before trial in this action.

Prior to trial, Red Star and Yangming moved to strike Mowen's demand for a jury trial. I reserved decision on the motion until after trial, empaneling a jury whose verdict could be treated as binding, advisory, or surplusage, depending on the eventual resolution of the issue.

In rendering its verdict the jury answered a number of interrogatories. It found total damages as follows:

| | |
|---|---|
| loss of support | $1,414,000 |
| loss of nurture | 550,000 |
| pain and suffering | 0 |
| Total | 1,964,000 |

As noted above, the jury allocated responsibility to:

| | |
|---|---|
| Yangming | 60% |
| Red Star | 35% |
| Mowen | 5% |

All of Red Star's liability and 20% of Yangming's share were attributed to the failure to rescue Dennis Mowen after the collision. The jury thus attributed 55% of responsibility for Mowen's death to the failure to rescue and 45% to the collision. Finally, the jury found Red Star management to have had privity or knowledge of the deficiencies on which it had based Red Star's liability.

*Discussion*

I. *Motion to Strike Demand for Jury Trial*

Yangming and Red Star, having preserved their position before trial, now move to strike the jury verdict in favor of a court-rendered decision. The motions are denied.

## A. Contentions Based on Red Star's Limitation Action

Defendants contend that, whatever Mowen's right to a jury trial might be if her claims were litigated apart from Red Star's limitation action, she is not entitled to a jury for this claim since it was tried as a part of a limitation petition in admiralty. They point out that the total claims made in the limitation proceeding far exceed the limitation fund of roughly $35,000. In such a situation, they contend, the issue of the petitioner's right to limitation is for the judge. If limitation is granted, the judge should go on to allocate liability and determine the claimants' pro rata shares of the fund. Red Star Memorandum of July 11, 1980 at 12; Yangming Memorandum of July 11, 1980 at 25. Defendants concede that if the judge determined Red Star was not entitled to limitation of liability, the court would have discretion to dissolve the injunction against other proceedings and permit claimants to pursue their claims outside the limitation proceedings, with jury trials where appropriate. Red Star Memorandum of July 11, 1980 at 12–13; Yangming Memorandum of July 11, 1980 at 26. Plaintiff argues that under *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), the right to a jury overrides competing interests in adjudication without a jury. *See Doughty v. Nebel Towing Co.,* 270 F.Supp. 957 (E.D.La.1967).

Both sides, accordingly, contend that the court has no discretion in the matter but must, according to defendants' view, conduct the proceedings without a jury, and according to plaintiff's view, with a jury.

■ I cannot accept the defendants' contention. There is no right, as opposed to a likely expectation, to a non-jury trial in admiralty. *Fitzgerald v. United States Lines Co.,* 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963), established that a litigant in admiralty is not entitled as a matter of right to a non-jury trial (admiralty action for maintenance and cure heard by jury when joined with Jones Act claim).

■ And I need not decide whether *Dairy Queen* establishes a right to jury trial in this case. Where claims with independent jurisdictional basis normally carrying a jury right, such as plaintiff's Jones Act claim, are joined with admiralty claims arising out of the same transaction or occurrence, all claims may be tried to a jury. *See Bartholomew v. Universe Tankships, Inc.,* 263 F.2d 437, 443–47 (2d Cir.1959) (Jones Act claim), *cert. denied,* 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959); *Best v. Honeywell, Inc.,* 491 F.Supp. 269 (D.Conn.1979) (D.O.H.S.A. and general maritime claims, diversity jurisdiction), *aff'd without opinion sub nom. Sikorsky Aircraft Division, United Aircraft Corp. v. Honeywell, Inc.,* 679 F.2d 874 (2d Cir.1981); *Mattes v. National Hellenic American Line, S.A.,* 427 F.Supp. 619, 628 (S.D.N.Y.1977) (Jones Act claim); *Parsell v. Shell Oil Co.,* 421 F.Supp. 1275, 1276 (D.Conn.1976) (federal question jurisdiction), *aff'd sub nom. East End Yacht Club v. Shell Oil Co.,* 573 F.2d 1289 (2d Cir.1977); *Oroco Marine, Inc. v. National Marine Service, Inc.,* 71 F.R.D. 220 (S.D.Tex.1976) (diversity jurisdiction). I have concluded, assuming the trial judge has discretion in the matter, that the proper exercise of discretion favors jury trial.

■ It is beyond dispute and conceded here that, if limitation is denied, the judge is authorized to dissolve the injunction against outside proceedings, freeing the death claimant to pursue her action before a jury. In my view, the circumstances of this case make it more appropriate to exercise that discretion so as to give precedence to plaintiff's jury demand. This is for several reasons: first, the relative weight and importance of the death claim as compared to other claims at issue in the limitation proceeding; second, the fact that a jury was empanelled and its verdict taken in the consolidated limitation proceeding so that no waste or retrial is required to utilize the jury's findings;[2] third, both the jury and

2. Defendants argued prior to trial that the limitation hearing should not be consolidated with

trial but should be held separately without a jury. Such a procedure might have required

the judge have concluded independently that limitation must be denied.[3] This third factor requires denial of Red Star's petition to limit liability and permits dissolution of the injunction barring plaintiff from pursuing her action in a separate proceeding before a jury. Since such a trial has already been conducted by the parties before a jury, it seems most appropriate, in service of the principles of *Dairy Queen* (if it is not required as a matter of law), to give effect to the jury trial that has been conducted.

### B. Contentions Based on the Death on the High Seas Act

Plaintiff's claims against Yangming are pleaded under the Death on the High Seas Act, 46 U.S.C. §§ 761–768 (1976 & Supp. IV 1980) (hereinafter sometimes "DOHSA"), and the general maritime law. Plaintiff contends that she has a cause of action against Yangming under general maritime law, that this court has jurisdiction over that claim by virtue of both admiralty and diversity jurisdiction, that the "saving to suiters" clause of 28 U.S.C. § 1333 permits her to bring her general maritime claim as a civil suit in which she has a right to trial by jury, and that, because her admiralty claim and her civil claim arise out of the same transaction, she is entitled to a jury trial on both claims. Yangming contends that DOHSA, without a jury, is plaintiff's exclusive remedy for death on the high seas; it relies principally on *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), contending that there is no alternative remedy to DOHSA to be saved by the "saving" clause.

Whether a general maritime remedy exists independent of DOHSA, carrying the right to jury trial for death in international waters, is a wide open question as to which the Supreme Court's eventual answer can only be guessed at from its arguably conflicting resolution of related questions. The pronouncement of the lower courts are in conflict.

In 1886, in *The Harrisburg*, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886), the Supreme Court held that general maritime law afforded no remedy for wrongful death in the absence of an applicable state or federal statute. Thereafter, although state wrongful death statutes provided remedies for deaths in state territorial waters (and sometimes beyond), *see, e.g., The Hamilton*, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264 (1907), no federal remedy existed for deaths on the high seas.

In 1920, Congress acted to fill this gap by passing the Death on the High Seas Act. DOHSA creates a remedy in admiralty for wrongful deaths more than three miles from shore, *i.e.*, outside state territorial waters. 46 U.S.C. § 761. The act determines a number of details with respect to the cause of action it creates. It limits the class of beneficiaries, 46 U.S.C. § 761, allows suits filed by the victim of an accident to continue if the victim dies of his injuries while his suit is pending, 46 U.S.C. § 765, provides that contributory negligence will not bar recovery, 46 U.S.C. § 766, and limits recoverable damages to pecuniary loss, 46 U.S.C. § 762.

Prior to 1970, federal courts construing DOHSA held that suits under the Act could be maintained only in admiralty and without juries. In *Higa v. Transocean Airlines*, 230 F.2d 780 (9th Cir.), *cert. dismissed*, 352 U.S. 802, 77 S.Ct. 20, 1 L.Ed.2d 37 (1956), the Ninth Circuit decided that the statutory phrase, "may maintain a suit for damages in the district courts of the United States, in admiralty ...," ruled out jury trial even if diversity of citizenship existed. In rejecting the contention that the "saving to suiters" clause preserved the right to sue

---

the repetition of months of trial, which alone seems sufficient reason not to adopt it, without even reaching the question of the proper application of *Dairy Queen* principles.

**3.** I find independently on convincing evidence, that the crew of the Ocean King was negligent in its failure to attempt meaningful rescue op-

erations and that, for reasons set forth *infra* pp. 375–377, this failure is properly considered a cause of Dennis Mowen's death. I find that the owner was responsible for and in privity with this failure by reason of failure of the owner to provide proper training.

under diversity jurisdiction and thereby obtain a jury trial, the court noted "that the High Seas Act deprived no state or federal court of a then existing right." 230 F.2d at 782. The court relied also on a colloquy on the floor of the House in which it was said that "this proceeding will be in admiralty and that there will be no jury." 230 F.2d at 784 (quoting 59 Cong.Rec. at 4482).

Between 1920 and 1970, deaths on the high seas gave rise to suits under DOHSA, and those occurring in territorial waters were governed by the various states' wrongful death statutes. This structure resulted in a captious lack of uniformity.

Then the Supreme Court held in *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), that a federal cause of action did exist under general maritime law for wrongful deaths occurring within territorial waters. Most of the reasoning in the opinion deals with anomalies resulting from the absence of a federal remedy within state territorial waters and has no necessary application to the question of existence of any general maritime remedy in international waters.[4] Justice Harlan stated in passing that he found in DOHSA "no expression of policy bearing on" any "desire to avoid the presentation of wrongful death claims to juries ...." Id. at 400 n. 14, 90 S.Ct. at 1787–88 n. 14. The opinion concluded "that the Death on the High Seas Act was not intended to preclude the availability of a remedy for wrongful death under the general maritime law *in situations not covered by the Act.*" 398 U.S. at 402, 90 S.Ct. at 1788. (emphasis supplied)

*Moragne* left open a number of subsidiary questions concerning the nonstatutory death remedy that was held to survive DOHSA within territorial waters. One of those arose in *Sea-Land Services, Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), which, like *Moragne,* involved a death inside territorial waters.

The Court held that the appropriate measure of damages under the general maritime remedy included damages for loss of society, notwithstanding that these were excluded by DOHSA for deaths on the high seas.

Some lower courts read *Moragne* and *Gaudet* to create a general maritime cause of action for wrongful death surviving DOHSA in international, as well as territorial, waters. *See, e.g., Law v. Sea Drilling Corp.,* 523 F.2d 793 (5th Cir.1975).

But so broad a reading of *Moragne* and *Gaudet* was, at least to some extent, repudiated in *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), which considered whether damages for loss of society, expressly authorized in *Gaudet* for deaths occurring in territorial waters, could be recovered for deaths outside the three mile limit. The Court ruled that DOHSA established the exclusive measure of damages for wrongful death on the high seas; loss of society could not be recovered. The majority stated that:

> [t]he Death on the High Seas Act ... announces Congress' considered judgment on such issues as the beneficiaries, the limitations period, contributory negligence, survival, and damages.... The Act does not address every issue of wrongful-death law, ... but when it does speak directly to a question, the courts are not free to "supplement" Congress' answer so thoroughly that the Act becomes meaningless.

*Id.* at 625, 98 S.Ct. at 2015.

The decision does not explicitly answer whether there is a general maritime remedy for death at sea, the question first answered in the negative by *The Harrisburg,* but later in the affirmative as to territorial waters by *Moragne;* whether the survival of any such remedy, if it exists for the high seas, has been pre-empted or cut-off by the express statutory remedy of DOHSA, which

---

4. Language can be found that, read in isolation, seems to endorse the survival of a general maritime remedy, regardless of location. It is questionable how much can be read into this language as to international waters. The statements were clearly intended to refer to the question under consideration, which was the survival of a general maritime remedy in waters *not* covered by DOHSA.

it does answer in the affirmative as to aspects of any such general remedy that conflict with express provisions of DOHSA; and finally, if such a remedy exists and survives DOHSA for elements that are not in conflict with DOHSA's provisions, whether DOHSA should be construed to have rejected the availability of a jury trial for deaths on the high seas in diversity cases.

The decisions of the lower courts since *Moragne* are in irreconcilable conflict. *Compare Best v. Honeywell, Inc.,* 491 F.Supp. 269 (D.Conn.1979), (DOHSA not the exclusive remedy; general maritime remedy exists) *aff'd without opinion sub nom., Sikorsky Aircraft Division, United Aircraft Corp. v. Honeywell, Inc.,* 679 F.2d 874 (2d Cir.1981) *and First & Merchants National Bank v. Adams,* No. 79–365–N (E.D.Va. Oct. 22, 1979) (same) *with Andersen v. Vought Corp.,* No. 79–1021 (M.D.Fla. May 14, 1980) (DOHSA is exclusive remedy). The Fifth Circuit has held that DOHSA is the exclusive remedy. *Heyl v. Carnival Cruise Lines,* 1981 AMC 2393 (5th Cir.1981) (*per curiam;* opinion stamped "DO NOT PUBLISH"). The Second Circuit has discussed the issue in dicta. *Public Administrator of the County of New York v. Angela Compania Naviera, S.A.,* 592 F.2d 58, 63 (2d Cir.), *cert. dismissed,* 443 U.S. 928, 100 S.Ct. 15, 61 L.Ed.2d 897 (1979). ("The general maritime cause of action is, of course, available to plaintiffs" when the death at issue occurs outside state territorial waters.)

Because of the procedural posture of this case, these difficult questions need not be answered. For the DOHSA claims here asserted against Yangming do not arise in procedural isolation. They were joined for trial with Mowen's Jones Act and unseaworthiness claims against Red Star. It is surely preferable as a matter of rational procedure for the claims on each leg of the liability and contribution triangle to be tried by the same trier of fact. More is at stake than consistency or aesthetics. Each ruling as to percentage of responsibility is interdependent with the others, and if different triers of fact allocate responsibility differently as between the three parties, one party could end up paying a larger share than either factfinder found appropriate, unable to recover the appropriate share of contribution.

I have ruled, above, that it is at least preferable as a matter of discretion, and perhaps constitutionally required, that the Jones Act claims be tried by jury. We have therefore a DOHSA claim joined for trial with the same plaintiff's Jones Act claim, which is tried to a jury and involves the same issues of fact. The question is whether DOHSA or the general law of admiralty forbids the more rational procedure of using the Jones Act jury also to decide the DOHSA issues.

The Supreme Court's *Fitzgerald* decision seems fairly to imply that the general law of admiralty holds no obstacle and indeed encourages such a procedure. 374 U.S. at 20, 83 S.Ct. at 1650; *see Blake v. Farrell Lines,* 417 F.2d 264 (3d Cir.1969) (third-party claim for indemnity may be tried to jury along with longshoreman's diversity suit against defendant/third-party plaintiff); *Simko v. C & C Marine Maintenance Co.,* 594 F.2d 960 (3d Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 64, 62 L.Ed.2d 42 (1979) (admiralty claims may be left to be determined by jury after directed verdict granted in favor of defendant on plaintiff's Jones Act claim); *Bergeria v. Marine Carriers, Inc.,* 341 F.Supp. 1153 (E.D.Pa.1972) (admiralty counterclaim may be tried to jury); *Gvirtsman v. Western King Co.,* 263 F.Supp. 633 (C.D.Cal.1967) (DOHSA claim may be tried to jury when joined with Jones Act claim against same defendant).

I can find in DOHSA no command that trials must be without a jury. It does indeed provide that an appropriate plaintiff "may maintain a suit for damages in the district court . . . in admiralty . . . ." Read literally, these words merely place such actions within the admiralty jurisdiction of the federal courts. They do not purport to nullify the saving to suitors clause where diversity of citizenship would confer another basis of jurisdiction. They do not pur-

port to prevent state courts from exercising jurisdiction over DOHSA claims.[5] And although juries were conventionally not employed in admiralty suits, the words of the statute express no intention to forbid the use of juries either in diversity cases or in the admiralty.

█ Although the reference to the admiralty jurisdiction most likely indicated an expectation that DOHSA cases would ordinarily be tried without juries, as noted above the Supreme Court in *Moragne* found no convincing "expression of policy" in the legislative history on this issue and in *Fitzgerald* ruled that an admiralty cause of action might properly be tried before a jury. I conclude that DOHSA should not be construed to forbid the employment of a jury, at least in a case that presents such valid reasons for its use. The motions to strike plaintiff's demand for a jury trial are accordingly denied.[6]

II. *Motions for Judgment N.O.V.*

█ In passing on a motion for judgment notwithstanding the verdict,

the trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Rather, after viewing the evidence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgment n.o.v. only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 167–68 (2d Cir. 1980); *See Howes v. Great Lakes Press Corp.*, 679 F.2d 1023, 1030 (2d Cir.1982) (quoting *Mattivi* and applying the standard on appeal).

█ As to Yangming, there was abundant evidence supporting a finding of liability. The best examples are the captain's misassessment of the situation, resulting in the catastrophic left turn, failure to blow a timely danger signal and failure to obey the stand-by statute, 33 U.S.C. § 367 (1976). The absence of a lookout, who had been sent off to prepare the ladder for the pilot,

5. Although some courts have found the federal jurisdiction of DOHSA claims to be exclusive, the Supreme Court suggested in *Moragne, id.*, 398 U.S. at 400 n. 14, 90 S.Ct. at 1787–88 n. 14, that these decisions were incorrect.

6. Defendants also contend that Mowen's action must be tried in admiralty without a jury by reason of Fed.R.Civ.P. 9(h), which allows a party to identify specifically as an admiralty claim any claim within the admiralty jurisdiction of the district court and also within the court's jurisdiction on some other ground. A pleader is thereby permitted to "claim the special benefits of admiralty procedures and remedies, including a nonjury trial ...." *Romero v. Bethlehem Steel Corp.*, 515 F.2d 1249 (5th Cir.1975). It has been held that a Rule 9(h) identification made in a maritime tort case defeats or destroys the right to jury trial, even if diversity jurisdiction over the same claim exists. *Best v. Honeywell, Inc.*, 491 F.Supp. 269 (D.Conn.1979); *aff'd without opinion sub nom. Sikorsky Aircraft Division, United Aircraft Corp. v. Honeywell, Inc.*, 679 F.2d 874 (2d Cir. 1981); *Gilmore v. Witschorek*, 411 F.Supp. 491, 496 (E.D.Ill.1976). See also *Haskins v. Point Towing Co.*, 395 F.2d 737, 743 (3d Cir.1968);

*Peace v. Fidalgo Island Packing Co.*, 419 F.2d 371 (9th Cir.1969); Fed.R.Civ.P. 9(h), Advisory Committee Note, 39 F.R.D. 69, 75–76 (1966).

Defendants' contention that Mowen's claims have in fact been identified as admiralty claims under Rule 9(h) is based on the fact that Red Star's complaint in the limitation action designated the claims therein as being within the admiralty jurisdiction. The contention that Red Star's designation undermines Mowen's right to a jury trial is based on a misreading of Rule 9(h). The rule provides that "[a] pleading or count setting forth a claim for relief ... may contain a statement identifying the claim as an admiralty or maritime claim for the purposes of" Rule 38(e). It is not the whole action but the *claim* that may be designated as being within the admiralty jurisdiction of the court. Red Star's complaint designated Red Star's claim as being in admiralty. Whether or not Mowen designated her claims as being in admiralty depends on the pleading in which her claims were set forth, i.e., her answer. In fact, Mowen's answer makes no such designation with respect to her counterclaims and cross-claims; diversity jurisdiction is alleged. Answer at 3.

is another.[7] Yangming's motion for judgment in its favor notwithstanding the verdict is completely without merit and must be denied.

 Red Star's motion stands on at least arguable footing but also must be denied. Red Star was cleared by the jury of any responsibility for the collision. The sole basis of its liability was its failure to save Mowen after the collision. On this point, there was ample and convincing evidence of negligence in the failure to plan and properly organize a search. Red Star argues that this failure played no causative role because, it contends, there was no evidence that Mowen was alive and thus capable of being saved.

I heard extensive argument on this point during the trial, when Red Star sought to exclude the evidence of failure to rescue. I ruled against Red Star, and now after further consideration reaffirm that ruling. Although there is no direct evidence in the form of eyewitness testimony of what happened to Mowen, there is adequate circumstantial evidence supporting the inference that Mowen was not killed by the collision but went over the side safely. This is not a case like *McMillan v. Marine Sulphur Shipping Corp.*, 607 F.2d 1034 (2d Cir.1979), *cert. denied*, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980), in which different alternatives are equally plausible, some supporting liability, some not, leaving insufficient basis to overcome a burden of proof.

 I find on the proven facts that the logical inferences supporting a safe entry into the water substantially outweigh the possibility that the crash killed Mowen. The evidence indicates that Dennis Mowen had about thirty seconds, ample time, after

collision had become inevitable and he had blown his last whistle blasts from the wheelhouse to run from the wheelhouse to a safer position down on the starboard side of the main deck. There is every reason to believe that he hastened down the ladder to the main deck (just above the water line) and either jumped or was forced over the side when the tug heeled far over to starboard at the moment of the collision. Such conduct on Mowen's part is far more probable than that he remained inside the wheelhouse, the most dangerous place for him to be, for thirty seconds after his presence there ceased to have utility but subjected him to obvious and unnecessary risk. Nor is there any strong indication that he was killed by the shock of impact. No other members of the crew were seriously injured by the impact. He was the one who had the best opportunity to protect himself because he knew it was coming. It is most unlikely that he went to the port side where the impact was to take place. I conclude it is more likely than not that Mowen went over the side alive and remained afloat for at least a time. There was sufficient evidence to support plaintiff's burden of proof that Mowen was capable of being saved. The tug's failure to undertake proper rescue operations was a contributing cause of his death.[8] Red Star's motion for judgment n.o.v. must be denied.

### III. Motions to Set Aside or Reduce the Verdict

 The motions to set aside the jury's verdict, or in the alternative to reduce it, present serious questions. Such motions differ substantially from motions for judgment notwithstanding the verdict. As to the latter, the evidence must be

---

7. As to the absence of a lookout, the issue of causation is debatable because the captain had the Ocean King under observation. Particularly when considered in the light of the *Pennsylvania* rule, *The Pennsylvania*, 86 U.S. 125, 22 L.Ed. 148 (1874), I find adequate evidence that the absence of a lookout contributed to the cause of the collision. Had the lookout been assigned to watch the surrounding waters, the captain might have been able to concentrate more effectively (and with better results) on

the Ocean King. Also, the lookout might have watched the Ocean King and offered observations to correct the captain's erroneous perception.

8. It is also worth noting, although unnecessary to carry the point, that under the Jones Act even a slight causal connection is sufficient to satisfy the requirement. *Milos v. Sea-Land Service*, 622 F.2d 574 (2d Cir.), *cert. denied,* 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 219 (1980).

viewed in the light most favorable to the winner of the verdict; judgment n.o.v. may not be granted unless this view of the evidence cannot support the verdict. In contrast, a motion to set aside the verdict may be granted even though there is substantial evidence supporting the verdict if "it is quite clear that the jury ha[s] reached a seriously erroneous result." *Bevevino v. M.S. Saydjari,* 574 F.2d 676, 683–84 (2d Cir. 1978) (quoting 6A J. Moore, Moore's Federal Practice ¶ 59.08[5] (1973) at 160–61). The judge is free to weigh the evidence independently and need not view it, as in a motion testing the sufficiency of the evidence, in the light most favorable to the prevailing party. 574 F.2d at 684. When a jury is found to have erred in awarding excessive damages by reason of passion, prejudice or sympathy, the court may require the winner of the excessive verdict to choose between a new trial and acceptance of a reduced award. *Lanfranconi v. Tidewater Oil Co.,* 376 F.2d 91 (2d Cir.), *cert. denied,* 389 U.S. 951, 88 S.Ct. 333, 19 L.Ed.2d 360 (1967); (6A J. Moore, Moore's Federal Practice ¶ 59.05[3] (2d ed. 1979) at 47–48). I have decided that the excessiveness of the jury's award, coupled with the deliberate (and uncorrectable) misconduct of plaintiff's counsel, Theodore Friedman, Esq., in sending into the jury room a misleading exhibit on damages he knew not to have been in evidence, warrant setting aside the jury's verdict or, if the plaintiff accepts the remittitur, reduction of the jury's award.

## A. Loss of Nurture

██ The jury awarded $550,000 in damages for loss of nurture to Dennis Mowen's two children. I find that this award was excessive, unwarranted by the evidence, attributable to sympathy and an improper

summation by plaintiff's counsel, and must be set aside.

Dennis Mowen's children were seven and four years old at the time of his death. Lorraine Mowen testified [9] that her husband's work schedule at sea required that he work around the clock away from home every other week; he spent each intervening week at home. She testified that he took the children for walks in the woods, teaching them about nature, and permitted them to help him perform various household tasks. He taught his son about celestial navigation with a telescope. He played the guitar and sang songs with the children. She further testified that he was an attentive father who made an effort to spend time with his children.

An award for loss of nurture does not extend to compensation for grief resulting from the loss of the warm and loving parental relationship. It is a more limited and more measurable award for loss of valuable services in the nature of instruction, training and guidance.

In his summation, Mr. Friedman suggested to the jury $1 million as an appropriate figure. This number was wildly beyond what the evidence would support and was therefore an improper suggestion. The jury returned a verdict of $550,000, which also is sufficiently far beyond what the evidence supports as to justify setting it aside unless the plaintiff remits a substantial portion of it.

Although adult children can also suffer from loss of nurture, the vast majority of the loss established by the evidence here must be attributed to their early years. The evidence presented by the plaintiff involved activities that certainly would have become infrequent as the children became older.

---

9. Lorraine Mowen testified via videotaped deposition at her own choice in order to conceal from the jury the fact that she was pregnant. Plaintiff's counsel apparently contends that the inadequacy of the evidentiary record in support of this element of damages is at least in part attributable to holding the trial while Mowen was pregnant. This contention is incomprehensible and frivolous. The fact that plaintiff chose for her own tactical reasons to present her testimony to the jury by videotape on a television screen, rather than sit in the witness box, detracted not at all from her opportunity to testify on any issue she chose. Whatever the relevance, she also attended several sessions of the trial, remaining seated behind the spectator rail so only her head and shoulders would be visible to the jury. As to the scheduling of trial, see Memorandum Opinion dated October 23, 1981.

Counting the full time from their father's death until legal majority, 11 years would pass during which both children were minors, plus 3 more in which one child was a minor. Using the average of 12½ years, the award amounted to $44,000 per year.[10]

If one concentrates on the years prior to adolescence, those years during which psychologists generally agree that the influence of the parents is the greatest, the award values the loss at approximately $73,000 per year.

The jury's award is far out of line with the evidence and no doubt was the product of sympathy rather than a fair evaluation of the evidence. I note also that the children were brought into court with their mother for the plaintiff's opening statement. Counsel's speech to the jury was understandably designed to play on the heartstrings; the result was that a child had to be led from the courtroom in tears, in the presence of the jury. I do not criticize bringing the child into court. The courtroom is a public place, and parties-in-interest, above all others, have a perfect right to be there. However, if such an incident elicits the passion of the jury so as to undermine the fairness of the fact finding process and produce an unjustified, excessive verdict founded on sympathy, that verdict must be set aside or subjected to remittitur.

I find that the evidence of loss of nurture supports a verdict of $150,000.

### B. *Loss of Support*

I have also concluded that the jury's award for loss of support must be set aside. This ruling is based on a combination of factors.

■ The first is the misconduct of the plaintiff's attorney, Mr. Friedman, in surreptitiously including among the exhibits to be sent to the jury an exhibit for identification that he well knew had not been received in evidence. This exhibit (PX 337B for id.), which purported to be a summary of computations, was inaccurate and misleading in that certain of the implied computations had not been performed, and had they been performed would necessarily have yielded results less favorable to the plaintiff.

To understand the significance of this unreceived exhibit, it is necessary to review the history of its evolution, which was characterized by error and evasion on the part of plaintiff's counsel and her economic expert, Dr. Conrad Berenson.

Dr. Berenson testified to establish the loss of annual support suffered by the plaintiffs as the result of Dennis Mowen's death and the size of a lump sum necessary to fund similar payments over the remaining years of Dennis Mowen's statistical life expectancy. In accordance with the Supreme Court's decision in *Norfolk & W.R. v. Liepelt,* 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), two new issues had become pertinent to the jury's consideration: first, the income taxes that would have been incurred by the deceased wage earner annually and that would therefore not have been available for his dependents' support; second, the amount of income taxes to be incurred by the plaintiff on the interest earned from the investment of her lump sum award. The first mentioned factor tends, of course, to decrease the award; the second tends to increase it, since the plaintiff needs an additional amount to offset her income taxes, without which her money will be exhausted before she has received the full stream of support payments to which she was found entitled. The amount to be added to a previously computed lump sum to offset the plaintiff's future taxes was referred to at trial as the "add-back".[11]

10. This figure is an approximation of the real value of the award in each subsequent year. Its accuracy depends on the relationship between the earning power of the lump sum awarded and the rate of inflation. *See infra* n. 12.

11. Consideration for the taxes imposed on income from the plaintiff's lump sum award is specifically recognized and authorized in *Norfolk & W.R. v. Liepelt,* 444 U.S. 490, 495, 100 S.Ct. 755, 758, 62 L.Ed.2d 689 (1980).

Dr. Berenson testified that the way to arrive at the add-back was a trial and error method. One starts with the sum that would be sufficient, if plaintiff invested it at appropriate interest rates and paid no taxes, to give plaintiff the stream of support payments that the jury finds warranted. To this sum one adds an estimated "add-back." A set of calculations is then repeatedly performed: the interest for the first year from the investment of the sum is added to the original principal; the income taxes to be imposed on those earnings are subtracted; and the payments to be made for the support of the plaintiff in that year are subtracted, leaving a carryover balance for the subsequent year. One repeats the process for each successive year until the fund is depleted to zero. If the depletion to zero occurs before plaintiff has received all support payments to which she is entitled, the estimated addback was too small and needs to be increased. If the depletion to zero does not occur until beyond the year for the last support payment, the estimate was too large, and the process must be repeated with a smaller estimated addback.

Questioning of Dr. Berenson by the court (out of the jury's presence) brought out that concealed in his figures was a fundamental inconsistency and error that must have improperly increased the add-back and the final lump sum number. His computations were required to use the income tax rates over the next 28 years in two calculations: first, to calculate the taxes that would be deducted from Dennis Mowen's gross income; second, to calculate the taxes that would be deducted from the widow's earnings on her fund. Berenson testified that there would be an overall inflation during this period, in his estimation at the average rate of 8%. With respect to Dennis Mowen's taxes, Berenson assumed that, regardless of the rate of inflation in wages, the percentage of Mowen's earnings that would go in taxes would remain constant at 28%.[12] This assumption (of a constant percentage of tax bite) tacitly assumed that Congress would repeatedly reduce the tax rates to protect taxpayers against inflation-based "bracket-creep." T. 6989–7001.

When, on the other hand, Berenson estimated the widow's taxes over the same future period of 28 years, he used today's tax table rates, without such reduction. *Id.*

The inconsistent assumption obviously favored plaintiff. Either the taxes to come out of Dennis' income were estimated far too low (by the year 2007, if Dr. Berenson's inflation prediction was correct, Mowen's income as a tug captain would have been $474,485 and yet his taxes were computed at only 28%, T. 6994) or the tax rates used to calculate the widow's add-back were far too high, or both.

When questioned, Dr. Berenson at first denied that there was any such inconsistency in his calculations. T. 6998. Eventually, he acknowledged that different rates must have been used on the two sides of the calculation. T. 6989–7003, 7140–41. He argued, however, that it was of small importance because the largest part of the widow's tax bill would be incurred in the early years when the reduction in tax rates would be, as yet, relatively small. T. 7001–02.

After this questioning, plaintiff's counsel, Mr. Friedman, acknowledged the correctness of my observation of inconsistency, characterized the mistake as inadvertent, apologized for not having seen it himself and offered to stipulate to a correction. T. 7001–7003.[13] Dr. Berenson also characterized the inconsistency as "without intent." T. 7002–03.

The following day, I questioned Dr. Berenson further, again out of the jury's presence. Although he had initially denied the inconsistency and both he and Mr. Fried-

---

**12.** Dr. Berenson testified it was unnecessary for his calculations to increase Mowen's earnings over time to account for inflation because of an equal offset for the inflation-based portion of the discount to present value of the widow's future payments. *See Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30 (2d

Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981).

**13.** A part of Mr. Friedman's comments expressing agreement do not appear in the transcript.

man upon acknowledging it had previously described the error as unintentional, now Dr. Berenson suggested that he had deliberately used the inconsistent tax rates, apparently because he argued its unjustified benefit to the plaintiff was not large and the amount of work necessary to construct comparable models would have been great.

In an effort to determine the size and importance of the consequences of the inconsistency, I asked Dr. Berenson whether the widow's tax rates might be brought into the same basis as that used for Dennis Mowen's taxes by applying today's tax rates to the present value of her future stream of earnings. T. 7142, 7147–48. Berenson said he was not sure. I then directed him to submit a demonstration of these calculations and added that if he disagreed with this approach, he could submit anything else he believed would correctly bring Lorraine Mowen's tax rates into line with those used for Dennis. T. 7141–7158.

Notwithstanding my direction on January 5, 1982 that these relatively simple calculations be provided within a few days, nothing had been submitted by January 14, just a short time before the defendants' expert on damages was scheduled to take the stand. T. 8329–8342. I directed that the calculations be provided by mid-day the following day, a Friday, during which the trial was in recess. T. 8330. Mr. Friedman said at that time that I might not be satisfied with what he was going to submit. T. 8339–41. The following day, he delivered two documents to my chambers (later designated as part of PX 385). One document was a handwritten sheet with three columns: The first column was headed "Years" and listed the numbers 1 through 28; the second column was headed "Taxable Earnings" and merely restated the taxable earnings that Berenson had already testified to as those he projected on Lorraine Mowen's lump sum award; the third column was headed "Discounted Taxable Earnings—8% Discount." The numbers in this column reflected the present value at 8% discount of the numbers in the second column. See T. 8346–47 (describing the

document for the record). Mr. Friedman also delivered a two-page memorandum from Dr. Berenson to him dated January 14, 1982. See T. 8348. The memo basically argued that the inconsistency in tax treatment that I had observed had little practical importance and was in any event justified to offset other unrelated assumptions Berenson had used that he argued were overly favorable to defendants. (Dr. Berenson had previously told the jury that these other assumptions favored the defendants, presenting them as indications of the fair and conservative nature of his calculations.)

The two documents did not even pretend to perform the tax computations I had directed and were a clear attempt to evade the issue and stall. They were also apparently not delivered to counsel for the defendants. Yangming Memorandum of August 4, 1982 at 5. The explanation offered for the lateness of this submission was insufficient time. But the submitted computations that were a part of what I had directed (the bringing to present value of the projected future earnings) would have taken Dr. Berenson less than an hour, as he frequently demonstrated on the stand. See T. 7150. The greater and more time consuming effort had gone into the preparation the rebuttal materials, which included two substantially more complex calculations designed to show that the assumptions and calculations to which Berenson had testified were overly favorable to the defendants. It appears that a part of the reason for the delay and avoidance was plaintiff's counsel's wish to avoid providing material that could help defendants' economist to undermine Berenson.

My still unsatisfied direction for the calculations was again discussed on January 18. Mr. Friedman at this point produced the two documents previously delivered to my chambers, supplemented now by a third document. This last document was a typewritten, two-page submission with a heading that read "re: Mowen, Total Tax:

"$655,240," with figures for each of 28 years, adding up to the sum stated. T. 8347.[13a]

On January 28, toward the end of the defendants' expert's testimony, Mr. Friedman offered these documents, now labelled PX 385, for admission into evidence. He argued that the figure labelled "total tax" ($655,240) on PX 385 should replace the figure labelled "add-back" ($804,608) on PX 337A, a chart that summarized Berenson's jury testimony and included the results of the inconsistent tax treatment. T. 9832. Mr. Friedman argued that the substitution of this "total tax" figure for the add-back on the old chart (PX 337A) would neutralize the error that resulted from the inconsistent tax treatment. T. 9926–32. (Mr. Friedman thus placed a value of approximately $150,000 on the error he and Dr. Berenson had previously argued was too small to bother calculating.) I later ruled that the receipt of Exhibit 385 (the "total tax") would depend on what Dr. Berenson would have to say about it if produced for cross-examination by the defendants. T. 9985–88.

Dr. Berenson returned on February 2 and answered questions out of the presence of the jury. He stated that the figure labelled "total tax" on Exhibit 385 was intended to replace the figure labelled "add-back" on Exhibit 337A, T. 10022, and that he had prepared another exhibit, marked PX 337B for identification, as a replacement for PX 337A. T. 10021–23.

Questioning by the court at this point brought out another fundamental flaw favoring plaintiff in Dr. Berenson's new testimony. The figure labelled "total tax" was necessarily too large as a replacement for the addback figure on PX 337A. Berenson's initial addback on PX 337A was arrived at by a cumulative series of computations; a change in any one number would necessarily change the numbers for each subsequent year. The new PX 385 used the same annual income numbers unchanged from PX 337A,[14] despite the annual reduction in tax rates. For each year, Dr. Berenson applied lower taxes but left the amounts of annual income unchanged. His only adjustment to the bottom line was a reduction by the sum of the reductions in the tax figures.

This approach failed to reflect the fact that each change must affect each subsequent year's figures. The reduction of tax in year 2 would have left a larger principal in year 3, which would in turn have produced a larger income in year 3 and a still larger principal in year 4, etc. The additional principal realized in year 2 would remain present for 26 years, producing larger income and larger carryover principal year after year. It therefore follows necessarily that the fund remained too large and would not have been exhausted by the 28th year.

On questioning by the court Dr. Berenson explicitly acknowledged the flaw in the contention that the figures in PX 385 could serve as addback in 337B. Once again he sought to minimize the consequences of his error in plaintiff's favor. In answer to a leading question by Mr. Friedman, and without explanation or substantiation, he testified that the error would probably not exceed 5% in plaintiff's favor. T. 10030–34.

In addition to the fundamental errors explained above, PX 385 and the testimony about it contained other errors. In the first place it is captioned "D. Mowen," which is inaccurate, as it pertains to Lorraine Mowen's income, not that of Dennis. Second, it is captioned "total tax," and Dr. Berenson, when asked by Mr. Friedman whether the figure represented "total taxes on the stream of income that would flow to Lorraine Mowen from the lump sum there involved," answered "Sure." T. 10014. Further questioning by the court, however, re-

---

**13a.** The description of this document is based on the trial transcript, confirmed by my recollection, as plaintiff's counsel was unable to locate the document when asked to deliver it to chambers.

**14.** The annual figures that are summarized in PX 337A were set forth in a computer printout identified as PX 349. These annual income figures were carried forth unchanged to PX 385.

vealed that the label "total tax" and the corresponding testimony of Dr. Berenson were inaccurate. The number did not represent total tax on the stream of income, but a total based on the application of current tax rates to the present value of the future income of the 337A fund. T. 10015.

The pertinence of these new figures was in fact never made clear. I had asked some three weeks earlier whether such a calculation would help me judge the size of the error resulting from Berenson's use of different tax rates for Lorraine's and Dennis' incomes in the same years. Dr. Berenson had replied at the time, "It might be; I'm not sure. I really don't know." T. 7147, 7150 ("But I am not so sure that it is the right approach. . . .").

PX 385 was eventually received upon the defendant's stipulation that it represented a correct application of today's tax tables to certain present value figures. This stipulation, however, did nothing to qualify the figure as either the total tax on Lorraine Mowen's income or as addback.

Mr. Friedman later renewed his request for the receipt in evidence of PX 337B. I ruled it would not be received in evidence but permitted Mr. Friedman to use it argumentatively in his summation. T. 10039–40. He did in fact refer frequently to PX 337B id. in his summation, arguing that the revised figures therein were consistent with an interpretation of the testimony of the defendants' economic expert. T. 10529–10532.

The jury began its deliberations at 10:17 a.m. on Friday, February 5. T. 10759. At 10:22 a.m., the jury sent a note requesting all exhibits in the case. T. 10761. When I informed counsel of the note, I cautioned that "[t]here also are exhibits that contain items which are not in evidence which the jury has been instructed to disregard. I am thinking of anything that has Berenson's calculations that have been stricken." T. 10762–63. Mr. Friedman replied, "Yes." Id. Later that morning, the evidence, consisting of hundreds of exhibits, was delivered by counsel to the clerk for transmission to the jury.

When the jury deliberations had finished, at about 5:00 p.m. on Saturday, and the trial was over, it was discovered that PX 337B id. was in the jury room, together with the exhibits that had been received in evidence.

After considering all the circumstances and taking the testimony of counsel and court personnel, I find beyond reasonable doubt that it was Mr. Friedman who caused PX 337B to be included among the evidence sent to the jury, and that this was done by him intentionally and with full awareness that it was in violation of the court's orders and rulings as to the receipt of the exhibit.

In response to the defendants' motions for new trial, Mr. Friedman submitted his affidavit on this issue. The affidavit said nothing one way or the other on the subject of his own knowledge or complicity but offered the explanation that his co-counsel, Mr. Cuccia, had sent the exhibit into the jury room in good faith in the mistaken belief that it was part of the evidence received. Friedman Affidavit of March 8, 1982 at 23. ("Mr. Cuccia acted in good faith. . . . Mr. Cuccia believed that since he had taken out the original uncorrected exhibits, the exhibit containing the corrected, record figures was to be included in the trial exhibits.") This affidavit was in curious form in that it said nothing about the affiant, but spoke for Mr. Cuccia without any affidavit from him.

This irregularity became more serious at the subsequent hearing, when Mr. Cuccia testified in contradiction to what the Friedman affidavit said about him. Mr. Cuccia testified that he had not caused PX 337B to be sent to the jury and, furthermore, that he was well aware at the time that it was not in evidence. He added that he had not participated in the preparation of Mr. Friedman's affidavit laying the blame on him, having been out of the country at the time of its preparation, and had only recently become aware of its contents. Supplementary Transcript, 40–43 (hereinafter "ST.").

It became still more serious upon Mr. Friedman's own testimony that he and Mr. Cuccia had had a conversation adverting to the fact that 337B was not to go to the jury. ST. 31, 33. Accordingly, even if Mr. Friedman believed that Mr. Cuccia had sent in the exhibit, he could not have believed what he set forth in his affidavit: that Mr. Cuccia had done this in "good faith" in the belief that it "was to be included in the trial exhibits."

The further testimony at the hearing was as follows:

Mr. Friedman testified that shortly after his conversation with Mr. Cuccia to the effect that PX 337A and B should not be sent to the jury, Mr. Friedman left the courthouse for a luncheon engagement, leaving the marshalling of the plaintiff's exhibits in Mr. Cuccia's hands, and did not return until sometime after all the exhibits had gone into the jury room. ST. 32–36, 75–78.

The falsity of Mr. Friedman's testimony is indisputably established by the testimony of virtually all the other participants and the trial transcript.

Mr. Cuccia confirmed that Mr. Friedman had been absent from the courtroom for a time during preparation of the exhibits, but did not confirm that Mr. Friedman was absent when they were sent to the jury. He said that he had placed exhibits that were to go to the jury against the jury rail at the side of the courtroom and exhibits not received at the back rail. He believed PX 337B id. was placed against the back rail. He testified explicitly that he did not place it among the received exhibits at the side. ST. 39–45.

Richard Brown, counsel for Yangming, testified that Mr. Friedman was in the courtroom while the exhibits were being collected and participated in certain conversations on the subject. ST. 7, 79. Harry Gotimer, also counsel for Yangming, testified that Mr. Friedman was in the courtroom when he (Mr. Gotimer) learned that the plaintiff's exhibits had been sent in without his having had an opportunity to examine them. ST. 13–14. James Leon-

ard, counsel for Red Star, testified that Mr. Friedman informed him that the plaintiff's exhibits were ready and was in the courtroom shortly before the exhibits went into the jury. ST. 17–18, 21–23, 27, 79.

The deputy clerk, Mr. Patrick Bowes, testified that he remembered Mr. Friedman being present in the courtroom when he took the exhibits for the jury. ST. 55–59. He testified that Mr. Friedman approved every pile of exhibits before Mr. Bowes picked them up to be taken into the jury. *Id.* He further testified that the exhibits he took into the jury room were in the vicinity of the jury rail and that he took nothing from against the back rail. *Id.* He said that Mr. Friedman appeared to take charge of the collection of exhibits for the jury. *Id.*

The trial transcript directly contradicts Mr. Friedman's contentions that he was not present during the collection of the exhibits and when they were sent into the jury room. As noted above, the jury sent the note requesting the exhibits at 10:22 a.m. T. 10761. Another note was received at 10:45 a.m. T. 10764. At that time, I asked, "Have you gotten the exhibits ready?" *Id.* Mr. Friedman replied, "The exhibits, yes. I understand there was another message since then." *Id.* I asked, "Are there any disputes about the exhibits." *Id.* Mr. Gotimer said that "[t]here may be two or three that are missing," *Id.,* and I directed the attorneys to "[s]end in now all exhibits on which you have agreement, as to which there is no dispute. They should be sent to the jury. I will direct they be delivered to the marshal to be delivered to the jury." *Id.* Thereafter, Mr. Friedman appears on eight of the next ten pages of the transcript. T. 10765–66, 10769–74. The jury came into the courtroom at 12:05 p.m., T. 10774, and returned to the jury room at 12:10 p.m. T. 10776. Mr. Friedman was present. T. 10777. Immediately thereafter, Mr. Friedman answered my question as to whether certain exhibits had been sent into the jury room, and participated in further colloquy, indicating that the exhibits had already gone in and that Mr. Friedman

had knowledge of what went in. T. 10777–79. Shortly thereafter came the luncheon recess. T. 10781–84. If Mr. Friedman left for a luncheon engagement as he testified, it is clear this did not occur until after the delivery of the exhibits to the jury.

My law clerk, Mr. Mark Drooks, testified as follows to what occurred after the end of the jury deliberations: On Saturday, February 6, 1982, as soon as the jury left the courtroom, Mr. Friedman stood up and said that he wanted to remove all of his exhibits from the jury room. ST. 62. Mr. Leonard suggested that the task could be postponed until the following Monday but Mr. Friedman insisted it should be done immediately. Mr. Drooks asked Mr. Bowes not to permit anyone into the jury room until it was checked. After the jurors left the room, he entered and found PX 337B id. with other placards. He then asked me to come into the jury room before dismissing the lawyers. He testified that after he showed me PX 337B, I brought it into the courtroom and told the lawyers that I was surprised to find it in the jury room after I had so clearly ruled it not in evidence. Mr. Friedman, Mr. Leonard, Mr. Brown and Mr. Cuccia were all present. Counsel for the defendants stated that they would like an opportunity to place the matter on the record. It was impossible to do so at the time because the court reporter had gone. Mr. Friedman said nothing. ST. 62–65.

After the above described testimony, Mr. Friedman took the stand again, in part to refute the possible inference from Mr. Drooks' testimony that his impatience to enter the jury room resulted from a desire to remove the incriminating exhibit. He stated that it was his uniform practice to secure all exhibits as rapidly as possible after trial so as to insure their preservation for appeal. ST. 72–76. This position was, however, significantly weakened by the testimony of Yangming counsel, Mr. Gotimer, that on Saturday evening after the end of the trial, Mr. Friedman did not remove the remaining exhibits. They remained in the courtroom over the weekend, and Mr. Friedman relied on defense counsel to pick up his exhibits for him. Defense counsel collected all the exhibits and forwarded plaintiff's exhibits to Mr. Friedman under covering letter nearly two weeks later. ST. 49–51. It appears that Mr. Friedman's sense of urgency to take possession of his exhibits diminished substantially after the court's discovery of PX 337B.

I conclude on overwhelming evidence that, through willful misconduct of plaintiff's counsel, the jury was sent an exhibit that had been excluded from the evidence because of its unsubstantiated, inaccurate and misleading nature.[15]

Plaintiff makes several arguments to the effect that this incident was harmless, or properly chargeable to the defendants for their misplaced trust. These arguments are imaginative but frivolous.

It is contended first that each of the numbers appearing on PX 337B was in evidence and that the exhibit as a whole could therefore not be prejudicial. This argument skirts the issue. PX 337B id. presents the number $655,240 as "ADDBACK FOR TAXES ON INCOME OF LUMP SUM." Although it is true that the number $655,240 was in evidence, it was not in evidence as the addback. It was received in PX 385 labelled as "total tax" on a series of numbers, determined by using current tax rates

---

15. Plaintiff contends it would be unfair to reach an unfavorable conclusion concerning a lawyer "with [a] longstanding, unblemished record[ ] in the profession." Plaintiff's Reply Memorandum dated August 27, 1982 at 23.

The making of this argument requires some comment that would not otherwise have been made. Mr. Friedman's behavior during 3½ months of trial given no support to plaintiff's argument of the unprobability of such conduct. Concerning his conduct as to the scheduling of trial, see Memorandum Opinion dated October 23, 1981. For examples during trial, see, T. 6143–45; 8873–76; 6146–50. See also the discussion in the text at pp. 32–37 concerning Mr. Friedman's affidavit and his testimony. As to this characterization of prior record, see *In the Matter of Theodore H. Friedman,* No. 71–4044 (S.D.N.Y. November 4, 1977) (Pollack, J.). I cannot accept plaintiff's argument that Mr. Friedman's prior conduct requires a different conclusion in evaluating the evidence as to PX 337B id.

in connection with the present value of certain hypothetical future earnings figures. Although Dr. Berenson began by testifying out of the jury's presence that it was addback, he then acknowledged that it could not be accurate as addback but was necessarily too large. *See supra* p. 381. When presented as the addback, this number was not only outside the evidence but was incorrect and prejudicially misleading to the detriment of the defendants.

Furthermore, it is hardly convincing for plaintiff to now argue the small importance of the exhibit when all of Mr. Friedman's conduct toward this exhibit made clear that he considered it enormously important. PX 337A, which summarized Berenson's initial testimony, had been struck because of his improper use of inconsistent tax rates. Mr. Friedman clearly did not want to swallow the bitter pill of calling Berenson back before the jury to acknowledge his significant mistake in plaintiff's favor. Mr. Friedman's offer of 337B as a substitute for 337A consumed an enormous amount of his energy and he argued vigorously that it should be received in evidence. He relied heavily on it in his summation. Even without reaching the further fact of surreptitiously sending it into the jury room, counsel's conduct makes clear that plaintiff considered the exhibit very important.

And, of course, it was important. It was designed to be accepted by the jury as the summary of Berenson's expert analysis. It tended to rehabilitate Berenson as against the contention that his testimony had contained errors. And Mr. Friedman's summation pointed to similarities between 337B and aspects of the testimony of defendants' economic expert as further support for Berenson's reliability.

I reject completely plaintiff's argument that the wayward exhibit was harmless and find to the contrary that it was important in the dynamics of the trial and carried a serious risk of prejudice when transmitted to the jury room.[16]

Next, Mowen contends that, since the exhibits were "made available to defense counsel for their review before the Clerk brought them into the jury room," Friedman Affidavit of March 8, 1982 at 23, the defendants must take responsibility for this exhibit having gone into the jury room. Whatever value their argument might have if the exhibit had gone in by plaintiff's accidental mistake, it has none where the conduct was intentional and surreptitious. That defense counsel trusted their adversary more than they should have does not bar them from complaining if that trust was abused.

Finally, Mowen argues that I should overlook this incident on the ground that the defendants also sent material not in evidence into the jury room. The allegation is utterly unsubstantiated.

In addition to my findings on counsel's misconduct, and the prejudicial potential of the exhibit, I also note that the jury's finding for loss of support, like the verdict for loss of nurture, was excessive, motivated by sympathy and not a realistic appraisal of the loss. The jury's award of $1,414,000 amounted to 87% of the highest figure for which plaintiff argued.[17] The latter figure was based on the assumption that Dennis Mowen would have been licensed, promoted to and hired as captain within four years of his promotion to mate (despite his sharing of fault in a major collision) with a lifetime of full employment and overtime as a captain, as well as assumptions concerning the widow's investment of her fund that un-

16. I also reject plaintiff's suggestion that the jurors be examined as to the effect of this exhibit on their deliberations. When the transmission of the exhibit to the jury is a deliberate attempt to influence the verdict, the opposing parties should not be required to run the risk of the jurors' faulty memory or characterization of their deliberations. In such a situation, a court is not required to go to such extraordina-
ry lengths to protect a verdict that the plaintiff has sought to subvert.

17. On summation, plaintiff abandoned contentions based on further promotion to "docking master." Such a contention was not supported by the evidence. Plaintiff was on notice that a verdict incorporating docking master earnings would be subject to reduction.

realistically maximized her tax liability and thus unrealistically maximized the addback factor and the award.

For all the reasons stated, I conclude that remittitur must be granted as to the award for loss of support in the amount of $300,000, or alternatively the verdict set aside.

### C. *Allocation of Fault*

■ Defendants also argue that the verdict should be set aside by reason of an allocation of fault overly favorable to the plaintiff. Mowen, of course, bore no responsibility for the failure to save him. I have already discussed and rejected the contention that there should be no award for failure to rescue because of insufficient proof that Mowen remained alive in the water. The allocation of fault as between the two ships for failure to rescue was reasonable.

Yangming contends the division of responsibility for the collision between it and Mowen on an 8 to 1 basis was against the weight of the evidence and requires setting aside. There was without question evidence that could have warranted placing a heavier share on Mowen, particularly the evidence that Mowen was late in making his required starboard turn and failed to signal in time. I cannot say, however, that the evidence required placing a heavier share of responsibility on Mowen. There can be no doubt that the captain of the Ming Giant made a catastrophic misassessment of the situation. I cannot rule that the jury's finding warrants setting aside the verdict.[18] The motion to set aside the verdict, to the extent it rests on the allocation of fault, is denied.[19]

### D. *Remittitur*

I have concluded that a reduction of the jury's findings on damages by $700,000 is

appropriate as a remittitur. I find that the evidence of loss of nurture supports a finding of $150,000, a reduction by $400,000 from the jury's award. The finding for loss of support is appropriately reduced by $300,000 to $1,114,000. This would reduce the verdict by 95% of $700,000, or $665,000, as 5% was charged against the plaintiff. The defendants' aggregate share would be reduced to $1,200,800. If plaintiff accepts this reduction, the defendants' motions to set aside the verdict will be denied. If not, they will be granted.

### E. *Possible Further Proceedings*

#### 1. *Scope and Nature*

In the event the plaintiff elects not to remit, an argument can be made that further proceedings should be limited to the issue of damages with the jury's verdict as to allocation of liability left undisturbed. I do not agree. The trial was flawed by plaintiff's overreaching in several respects already described. In addition, as Yangming bitterly complains, Mr. Friedman threw in a new theory on practically the last day of this 3½ month trial, and, summing up last, concentrated heavily on this theory. I cannot agree with Yangming's contention that there was no evidentiary support for this theory, although I readily agree that the theory was brought into the case in an unfair and surprising fashion. These circumstances leave an unpleasant taste on the tongue and argue persuasively against leaving the liability as determined by the first jury if the remittitur is rejected. *See Cosentino v. Royal Netherland S.S. Co.,* 389 F.2d 726 (2d Cir.), *cert. denied,* 393 U.S. 977, 89 S.Ct. 441, 21 L.Ed.2d 438 (1968).

On the other hand, I see no reason why the issue of Red Star's right to limit liability should not be deemed determined. As noted above, the jury's findings on this

---

18. If setting aside the verdict on this ground were appropriate, the recent decision of the Court of Appeals in *Akermanis v. Sea-Land Service, Inc.,* 688 F.2d 898 (2d Cir.1982) would bar a remittitur based on failure of the jury to allocate sufficient fault to plaintiff.

19. Red Star and Yangming also contend that a number of decisions I made at trial with respect to liability and evidentiary matters constituted legal error sufficient to warrant a new trial. I have reconsidered these matters and see no reason to change the views I expressed at trial.

issue agreed with those of the trial court and are properly warranted by the evidence.

The possibility also exists that no new trial will be appropriate even if the verdict is set aside. Perhaps, on the peculiar facts of this case, the misconduct of plaintiff's counsel in contriving to influence the jury by sending non-evidentiary material into the jury room should constitute a forfeiture of the plaintiff's right to jury trial. I have given extensive consideration to this question and have found no controlling authorities. If a party can be held to have forfeited the right to jury trial for nothing more than counsel's negligent failure to file a timely jury demand, Fed.R.Civ.P. 38(d); *General Tire & Rubber Co. v. Watkins*, 331 F.2d 192, 195–196, 197 (4th Cir.) (right to jury trial waived by failure to file timely demand; "There can be no doubt that the waiver provisions of rule 38 are constitutional"; trial judge did not abuse his discretion in refusing to grant jury trial based on practical difficulties jury would have understanding complex issues and savings of time afforded by not using a jury), *cert. denied*, 377 U.S. 952, 84 S.Ct. 1629, 12 L.Ed.2d 498 (1964), the deliberate misconduct found here certainly seems sufficient to justify the same result. The enormous cost to the defendants of having to relitigate by reason of plaintiff's misconduct toward the jury may also be a factor to be considered. Because no motion was made on this theory and no argument or briefing was directed to it, and because I have determined that a

remittitur is an adequate and more conventional response to the misconduct, at least at this stage of the litigation, I do not consider it necessary to pursue the issue of forfeiture at this point. If plaintiff declines to remit, so that the jury verdict is set aside, and defendants so move, I will direct that briefs be submitted on the question whether a new trial should be held before a jury or whether the misconduct discussed above should be ruled a forfeiture of the right to jury trial so that the court would proceed to enter its findings of fact based on the record of the trial that has already occurred.

### 2. Costs and Conflicts of Interest

If a new trial is conducted, it will result in large part from the intentional misconduct of plaintiff's attorney in surreptitiously slipping an unreceived exhibit into the evidence destined for the jury room.

Section 1927 of Title 28 provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Antitrust Procedural Improvements Act of 1980, § 3, 28 U.S.C.A. § 1927 (West Supp. 1982).[20]

Section 1927 currently refers to "excess costs", a phrase construed to cover only the narrow category of taxable costs, such as filing fees. The amendment . . . expands the category of expenses the judge might require an attorney to satisfy personally to include "excess costs, expenses, and attorneys' fees reasonably incurred because of such [dilatory] conduct." . . . [I]f an attorney does violate the existing standard covering dilatory conduct, and by such conduct causes the other parties to incur expenses and fees that otherwise would not have [been] incurred, the attorney should be required to satisfy personally this full range of excess costs attributable to such conduct.

1980 U.S.Code Cong. & Adm.News at 2782. It appears that section 1927 as amended constitutes an independent ground for the imposition

---

**20.** Prior to the amendment passed on September 12, 1980, the costs assessable under section 1927 were limited to those costs assessable against parties under 28 U.S.C. § 1920. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (decided on June 23, 1980). Thus, section 1927 was interpreted by many courts as nothing more than a mechanism for shifting costs from a party to his attorney, *see, e.g., 1507 Corp. v. Henderson*, 447 F.2d 540 (7th Cir.1971), rather than an independent basis for the assessment of costs. The legislative history of the 1980 amendment clearly indicates Congress' intent to decouple section 1927 from section 1920 and strongly implies that section 1927 as amended constitutes an independent ground for the imposition of sanctions on an attorney.

Wholly apart from § 1927, a federal court appears to possess inherent power to assess attorneys' fees against counsel in certain circumstances.[21]

There would appear to be a substantial basis in law, whether under § 1927 or under the inherent power of the court to control litigation in its presence, to award against Mr. Friedman all or a portion of the costs and attorneys' fees incurred by defendants in any retrial of this action, since it was his misconduct that, in large part, made the retrial necessary.

The foregoing mention of costs does not constitute a ruling, which would be premature as the matter has not been raised or argued and may, in any event, become moot. The possibility is raised now because it gives rise to a serious potential for conflict of interest. If counsel risks being held responsible for the adversary's attorney's fees in the event of retrial, the question must be faced whether he can act disinterestedly in advising his client on the acceptance or rejection of the remittitur, not to mention the conduct of a retrial. The matter is raised now to insure that the possibility of conflict receives the attention it de-

serves before plaintiff considers her choice with respect to the remittitur.

*Conclusion*

Red Star's motion to strike Mowen's jury demand is denied. Yangming's motion to strike Mowen's jury demand is denied.

Red Star's and Yangming's motions for judgment n.o.v. are denied.

Red Star's and Yangming's motions for a new trial are denied on the condition that Mowen remit 95% of $700,000, or $665,000, of the jury's verdict. Plaintiff Mowen is directed to inform the court in writing of her decision with respect to the remittitur.[22]

SO ORDERED.

---

of costs, expenses and attorneys' fees on counsel.

**21.** The Supreme Court recognized this power and discussed it at length in *Roadway Express,* the very case in which the court adopted a narrow interpretation of the old section 1927. In that case, the court recognized the inherent power of the court to dismiss an action and reasoned that, since assessment of counsel fees is a less severe sanction than dismissal, there was strong support for the power to assess such costs. *Roadway Express, Inc. v. Piper,* 447 U.S. at 765, 100 S.Ct. at 2463–64. The Supreme Court has recognized the authority to assess attorneys' fees as an exception to the general rule that each side bears its own costs in litigation. In *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975), the court acknowledged the "inherent power" of courts to

> assess attorneys' fees for the "willful disobedience of a court order . . . as part of the fine to be levied on the defendant[,] *Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 426–428 [43 S.Ct. 458, 465–66, 67 L.Ed. 719] (1923)," *Fleischman Distilling Corp. v. Maier Brewing Co., supra,* [386 U.S. 714] at 718 [87 S.Ct. 1404, 1407, 18 L.Ed.2d 475]; or when

the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . ." *F.D. Rich Co. [v. United States ex rel. Industrial Lumber Co.],* 417 U.S. [116] at 129 [94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 [ (1974) ] (citing *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962)).

421 U.S. at 258–59, 95 S.Ct. at 1622 (as quoted in *Roadway Express*). "Bad faith" may be found in the conduct of litigation as well as the filing of the action. *Roadway Express, Inc. v. Piper,* 447 U.S. at 766, 100 S.Ct. at 2464 (cases cited). The Court in *Roadway* went on to observe that

> [t]he power of a court over members of its bar is at least as great as its authority over litigants. If a court may tax counsel fees against a party who has litigated in bad faith, it certainly may assess those expenses against counsel who willfully abuse judicial processes.

*Id.* (footnote omitted).

**22.** Since plaintiff may need or wish to engage new counsel to advise her on this question, she shall be allowed two months to submit her decision.